**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JAMES B. JONES,**

      **Plaintiff,**

                            **Civil Action 2:12-cv-56**

    **v.**                         **Judge Michael H. Watson**

                            **Magistrate Judge Elizabeth P. Deavers**

**MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**


## REPORT AND RECOMMENDATION

Plaintiff, James Bernard Jones, who is proceeding without the assistance of counsel, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 14), the Commissioner's Memorandum in Opposition (ECF No. 15), and the administrative record (ECF No. 12). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

### I.    BACKGROUND

Plaintiff filed his applications for benefits on August 11, 2009, alleging that he has been disabled since October 2, 2008, at age 47. (R. at 159-61, 162-68.) Plaintiff alleges disability as

a result of type II diabetes mellitus, stage II chronic kidney disease, hypertension, diabetic neuropathy, left shoulder impingement, and depression.  (R. at 231, 305.)  The Social Security Administration denied Plaintiff's applications initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.

Administrative Law Judge Curt Marceille ("ALJ") held a video hearing on April 5, 2011, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 39-60.)  Michelle Peters, a vocational expert, also appeared and testified at the hearing.  (R. at 60-66.)  On April 20, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 15-28.)  On November 23, 2011, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-4.)  Plaintiff then timely commenced the instant action.

## II.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff testified that he stopped working in 2008, having been laid off.  (R. at 40.)  He represented that while he was laid off, his condition deteriorated such at he was unable to return to work.  (*Id*.)  He described a typical day as waking between 11:00 a.m. and 12:00 p.m., taking his medications, fixing breakfast, and then watching television.  (R. at 41)  He is able to drive and shop for short periods of time.  (*Id*.)  He stopped smoking approximately two and one-half years prior to the April 2011 hearing.  (R. at 43.)

Plaintiff testified that he suffers from pain in his feet, legs, back, and shoulder as well as constant headaches.  (R. at 41.)  He indicated that he began using a cane about a week before the hearing after he fell leaving his house.  (*Id.*)  He testified that he struggles with diabetes, but that

insulin helps.  (R. at 47-48.)  Plaintiff stated that without insulin, he experiences fatigue, vision problems, pressure on his eyes, blurred vision, and constant urination.  (R. at 48.)

When asked about Township assistance to help pay for his medical bills, Plaintiff testified that it only helped him once.  (R. at 44.)  He explained that only that beyond this one instance, he has not applied for Township assistance because it required him to go to lot of places to get documentation.  (*Id*.)  Plaintiff stated that Medicaid denied his application, but he could not recall why and has not reapplied.  (R. at 44-45.)  He indicated that Gary Community Health gives him a thirty-day supply of medications and insulin samples.  (R. at 46.)  Plaintiff has also been able to obtain free medication from drug companies through low income programs. (*Id*.)

Plaintiff estimated that he could lift thirty pounds with his right hand and could lift ten pounds with his left hand due to pulling on the left shoulder.  (R. at 49.)  He stated that he could sit for thirty minutes and stand between fifteen and twenty minutes due to tightness in his back muscles.  (*Id*., R. at 56.)  Plaintiff testified that his left shoulder impingement bothers him and that his legs become numb with prolonged sitting.  (R. at 49-50.)  He reported that he also has dull aches and pain in his back.  (R. at 56.)  He believes he could walk "a couple of blocks" before his legs would start to ache and his calves would get hard.  (R. at 57.)

## B.    Vocational Expert Testimony

Michelle Peters testified as the vocational expert ("VE") at the administrative hearing. (R. at 60-66.)  The ALJ proposed a series of hypothetical questions regarding Plaintiff's residual functional capacity to the VE.  The ALJ first asked the VE to consider an individual of Plaintiff's age, education, and past work experience who was limited to light work, but could never climb

ladders, rope and scaffolds; could not work with hazards including unprotected heights and dangerous machinery; could only occasionally climb ramps and stairs; could only occasionally balance, stoop, but never crouch or crawl; and due to a history of left shoulder problems, could only occasionally perform overhead reaching with the left shoulder.  (R. at 62-63.)  Based upon this hypothetical, the VE acknowledged that such an individual could perform Plaintiff's past relevant work as an unarmed security guard.  (R. at 63.)  In addition, the VE testified that such an individual could perform other light, unskilled jobs that would be available at the state and national levels, such as inspector, assembler, and cashier.  (*Id*.)

Based on the second hypothetical, which reduced the exertional level to sedentary, the VE testified that there would be no transferability of skills.  (R. at 64.)  The individual could, however, perform the sedentary job duties of an assembler, inspector, or clerk.  (*Id*.)

The VE testified that she believed her testimony was consistent with the Dictionary of Occupational Titles ("DOT").  (*Id*.)

Upon cross-examination, the VE testified that if the individual was limited to standing and walking no more than fifteen minutes at one time before sitting for a half an hour, it would eliminate the cashiering position and reduce the available inspection and assembly positions by a minimum of fifty percent.  (R. at 65.)  The VE further testified that if the individual was unable to utilize both of his upper extremities at least on a frequent basis, the above positions would no longer remain.  (R. at 65-66.)  The VE added that if the individual would need to lie down for one or two hours in an eight-hour day because of low energy from uncontrolled blood sugars and from pain, that would preclude employment.  (R. at 66.)

### III.    MEDICAL RECORDS

4

A.      **Physical Impairments**

Plaintiff reported to the Greater Milwaukee Free Clinic from February 2006 through August 2008 for treatment.  (R. at 312-22.)  He was seen for check-ups and diabetes medication. (*Id*.)  Plaintiff sustained a left rotator cuff tear in February 2008.  (R. at 316.)  As a result, Plaintiff was unable to rotate his arm above his head.  He reported that his arm felt better with exercise.  (*Id*.)  He was given exercises to perform and insulin medication.  (*Id*.)

On August 20, 2009, after examining Plaintiff, Augustine Izah, M.D. completed a Determination of Medicaid Disability form on behalf of the State of Indiana and found only moderate limitations in walking and lifting.  (R. at 339-50.)

In October 2009, J. Smejkal, M.D. examined Plaintiff on behalf of the Indiana Disability Determination Bureau.  (R. at 351-55.)  Plaintiff denied alcohol use, but reported smoking about a pack of cigarettes daily.  (R. at 351.)  Plaintiff complained of diabetes, a torn shoulder, and a bad disc in his back.  (R. at 351.)  Plaintiff reported that he was diagnosed with diabetes in 1992 and is insulin dependent.  He also complained of unrelenting blurred vision, with some days being worse than others and constant headaches.  He reported pain in his feet that he estimated he began experiencing approximately two years prior to the examination.  Plaintiff stated that he tore his rotator cuff in 2008 while breaking up a fight in his capacity as a public safety officer. He indicated that he was unable to claim workers compensation for the injury because he went to a free clinic and neglected to report the incident.  Plaintiff represented that he has been unable to have an x-ray or MRI because he has no insurance.  He reported that he is unable to raise his arm higher than his chest and refused to try.  Dr. Smejkal noted that Plaintiff walked with a cane, but that he had not been prescribed the cane. Dr. Smejkal's examination of Plaintiff's eyes revealed

no evidence of diabetic or hypertensive retinopathy.  (R. at 352.)  He noted that Plaintiff

experienced visual disturbance bilaterally.  Dr. Smejkal's musculoskeletal examination of

Plaintiff revealed normal curvature to the cervical, thoracic, and lumbar spine.  He noted no

anatomic deformities; no spinous or paraspinal tenderness in any region; full range of motion in

lumbar, cervical, and thoracic region; negative bilateral straight leg raise test; and no deformities

in Plaintiff's upper extremities.  (R. at 353.)  Dr. Smejkal observed that Plaintiff is able to stoop

and squat without difficulty; walk heel to toe and tandemly without difficulty; get on and off the

examination table without difficulty and without assistance; and stand from a sitting position

without difficulty.  He observed that Plaintiff "walked in with a straight posture" and "has a

normal gait."  (R. at 352, 354.)  Dr. Smejkal also noted that Plaintiff "appear[ed] comfortable in

the seated and supine position."  (R. at 352.)  He diagnosed Plaintiff with insulin dependent

diabetes, poor vision, history of left torn rotator cuff with restricted range of motion, rule out

herniated disc, and hypertension not controlled.  (R. at 354.)

On November 24, 2009, Munster Eye Care Associates, P.C. conducted an ophthalmology

examination of Plaintiff on behalf of the Indiana Disability Determination Bureau.  (R. at

358-60.)  This examination revealed that Plaintiff had mild cataracts and advised glasses and

better glycemic control.  (R. at 360.)  The examining physician concluded that Plaintiff retained

"[n]ormal visual function."  (*Id*.)

In December 2009, state-agency physician, B. Whitley, M.D. reviewed the record and

assessed Plaintiff's physical functioning capacity.  (R. at 363-70.)  Dr. Whitley opined that

Plaintiff could lift/carry and push/pull twenty pounds occasionally and ten pounds frequently;

stand and/or walk about six hours in a workday; and sit for about six hours in a workday.  (R. at

364.)  Dr. Whitley further opined that Plaintiff could occasionally climb ladders, ropes or scaffolds and frequently climb ramps/stairs, balance, stoop, kneel, crouch, or crawl.  (R. at 365.) He also found that Plaintiff would be limited in reaching in all directions, including overhead. (R. at 366.)  Dr. Whitley concluded that Plaintiff's allegations were only partially credible, explaining that they were "out of proportion to the objective [medical evidence]."  (R. at 368.) In April 2010, state-agency physician, J. Sands, M.D. affirmed Dr. Whitley's assessment.  (R. at 400.)

Plaintiff treated at the Gary Community Health Center from March 2010 to March 2011. (R. at 371-80, 428-58.)  Plaintiff was treated primarily for diabetes, neuropathy, arthritis, and hypertension.  The treatment records show that Plaintiff only sporadically complained of back pain.  (R. at 435, 438.)  Examination on November 13, 2010, revealed that Plaintiff had tenderness at L1-L5 levels and S1-S2 levels and decreased range of motion in the lumbar spine. (R 433-34.)  On December 16, 2010, consulting nephrologist Dr. K. Umapathy examined Plaintiff to evaluate his chronic kidney disease.  (R. at 440.)  Laboratory testing showed mildly elevated serum glucose and creatinine levels.  (R. at 447.)  Based upon the laboratory results, Plaintiff was diagnosed with stage II chronic kidney disease secondary to hypertensive and diabetic neuropathy.  (R. at 440.)  In January 2011, Plaintiff exhibited an abnormal gait and reported decreased sensations in his feet, bilateral leg pain, paresthesias, and abnormal sensory and motor function, but did not report any episodes of hyperglycemia.  (R. at 435-37.)

On March 25, 2010, B. Saaverda, M.D. examined Plaintiff on behalf of the Indiana Disability Determination Bureau.  (R. at 381-55.)  Plaintiff denied using alcohol, but reported smoking cigarettes daily.  (R. at 381.)  Plaintiff complained of diabetes, a torn shoulder, and a

bad disc in his back.  (*Id*.)  Dr. Saaverda observed that Plaintiff walked with a strait posture and had "a grossly normal gait but stiff."  (R. at 382, 384.)  She noted that he appeared comfortable in the seated and supine position.  (R. at 382.)  Upon examination, Dr. Saaverda found that Plaintiff had positive straight leg raising test bilaterally; restricted range of motion in the lumbar spine; and that he was unable to stoop and squat and had difficulty with walking heel to toe tandemly.  (R. at 383-84.)

On March 7, 2011, Eunjin Choi, N.P. completed a Multiple Impairment Questionnaire (R. at 420-27.)  Dr. Seabrook also signed this assessment.  Ms. Choi listed Plaintiff's symptoms as abnormal gait, decreased sensations in his feet, bilateral leg pain, and decreased range of motion.  Ms. Choi based her assessment on "lab results (blood work)" and "the medical records and [prescriptions] for other diagnoses."  (R. at 420.)  She noted that Plaintiff's pain included lower back pain, bilateral leg pain, and paresthesias.  (R. at 421.)  Ms. Choi opined that in an eight-hour day, Plaintiff could sit for two hours and only stand/walk for up to one hour.  (R. at 422.)  According to Ms. Choi, Plaintiff could occasionally lift and carry ten to twenty pounds with his right arm.  (R. at 423.) She further opined that Plaintiff's experience of pain, fatigue, or other symptoms were severe and constant such that they would interfere with his attention and concentration.  (R. at 425.)  Ms. Choi indicated that Plaintiff's health condition could improve if he properly took his medications.  (R. at 526.)   She further noted that Plaintiff needed to go to specialists for further evaluation and treatment.  (*Id*.)

When Plaintiff presented to the Northlake Emergency Department on March 25, 2011, he was diagnosed with lumbar disc disease, a lumbar strain, hyperglycemia, and other and unspecified disc disorder of the lumbar region.  (R. at 456.)

### B.    Mental Impairment

On April 12, 2010, Jeffrey Karr, Ph.D. examined Plaintiff on behalf of the state agency. (R. at 393-97.)  Plaintiff reported that he had quit his previous job due to his concerns about leaving his son alone in a dangerous neighborhood.  (R. at 394.)  He reported feeling depressed "watching [himself] deteriorate."  (R. at 395.)  Plaintiff also stated that he felt depressed because of his pain.  He reported constriction in interests.  (*Id*.)  Dr. Karr noted that Plaintiff's mood was dysphoric and that he had alleged some depressive symptoms, but that he did not have any reported treatment history.  Plaintiff's mental status exam was normal, and he did not exhibit any cognitive or memory difficulties.  (*Id*.)  Dr. Karr concluded that Plaintiff exhibited an average level of intellectual functioning.  He diagnosed Plaintiff with a depressive disorder not otherwise specified and assigned him a Global Assessment Function ("GAF") score of 60.[1]  (R. at 397.)

On April 23, 2010, after review of Plaintiff's medical records, B. Randal Horton, Psy.D. a state-agency psychologist, assessed his mental condition.  (R. at 401-14.)  Dr. Horton found that Plaintiff had mild restrictions of activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence or pace and that he had experienced no episodes of decompensation.  (R. at 411.)  Dr. Horton also found that the evidence did not establish the presence of the "Part C" criteria.  (R. at 412.)  In the narrative assessment, Dr. Horton concluded

---

[1]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).  A GAF score of 51-60 is indicative of an individual having "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

that Plaintiff's allegations were only partially credible and that he had a "[n]on-severe psych impairment." (R. at 413.)

## V.  THE ADMINISTRATIVE DECISION

On April 20, 2011, the ALJ issued his decision.  (R. at 15-28.)  At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since October 2, 2008.  (R. at 17.)  The ALJ next found that Plaintiff had the severe impairments of diabetes mellitus, stage II, chronic kidney disease secondary to hypertensive and diabetic neuropathy, and a history of left shoulder impingement.  (*Id.*)  He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 20.)  At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC").  The ALJ set forth Plaintiff's RFC as follows:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: [Plaintiff] can never climb ladders, ropes or scaffolds, or work with hazards including unprotected heights and dangerous

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.    Is the claimant engaged in substantial gainful activity?
    2.    Does the claimant suffer from one or more severe impairments?
    3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
    4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
    5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> machinery. He can occasionally climb ramps and stairs, stoop, balance, kneel, crouch and crawl. [Plaintiff] is also limited to an occasional overhead reaching with his left shoulder.

(*Id*.)  In reaching this determination, the ALJ gave "significant" weight to the opinion of Dr. Izah. (R. at 24.)  The ALJ also found his assessment consistent with the totality of the medical evidence of record.  (*Id*.)  The ALJ gave "little" weight to the opinion of Ms. Choi/Dr. Seabrook explaining that their opinion was unsupported by clinical evidence and contradicted by other substantial evidence in the record.  (*Id*.)  The ALJ also accorded "great" weight to the opinions of Drs. Whitley and Sands, the state-agency reviewing physicians.  (R. at 25.)  The ALJ found their opinions were generally consistent with and well supported by the totality of the evidence and an accurate representation of Plaintiff's residual functional capacity status.  (*Id*.)  The ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the RFC.  (R. at 23.)

Relying on the VE's testimony, the ALJ determined that Plaintiff was capable of performing his past relevant work as an unarmed security guard.  The ALJ also concluded at step five that there are jobs that exist in significant numbers in the state and national economy that Plaintiff can perform.  (R. at 30-32.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 32.)

## VI.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII.   LEGAL ANALYSIS

In his Statement of Errors, Plaintiff identifies what he characterizes as "untrue statements" and "discrepancies" within the ALJ's decision. He then asserts that the ALJ failed

to properly consider the opinion evidence; list depression as a severe impairment at step two; properly assess the Plaintiff's RFC; and support his step four findings with substantial evidence. The Undersigned considers each of Plaintiff's arguments in turn.

## A.      Alleged Discrepancies

Plaintiff's arguments regarding alleged discrepancies in the ALJ's decision do not support a finding of reversible error.  Plaintiff first asserts that the ALJ's finding of nondisability is inconsistent with the VE's testimony that an individual with his limitations would be unable to engage in substantially gainful activity.  Contrary to Plaintiff's assertion, in response to the ALJ's hypothetical question incorporating all of the limitations he included in his RFC, the VE testified that such an individual could perform Plaintiff's past relevant work as an unarmed security guard.  (R. at 63.)  He further testified that such an individual could perform other light, unskilled jobs that would be available at the state and national levels, such as inspector, assembler, and cashier.  (R. at 4.)

Plaintiff next alleges that the ALJ erred in stating that he continued to smoke in light of his April 2011 hearing testimony that he had stopped smoking more than two years prior to the hearing.  It appears that Plaintiff is referencing the ALJ's assessment of his credibility and in particular his notation that Plaintiff "continued to smoke, even when he had been out of medication for months by March 2010," which the ALJ found undermined Plaintiff's alleged inability to pay for his medications.  (R. at 22.)  In support of this statement, the ALJ referenced the March 25, 2010 report of Dr. Saaverda.  (*Id*.)  In this report, Dr. Saaverda noted that Plaintiff had acknowledged smoking cigarettes daily.  (R. at 381.)  Notably, in October 2009, Plaintiff also reported smoking approximately a pack of cigarettes daily to Dr. Smejkal.  (R. at 351.)  The

ALJ proceeded to set forth a number of facts that he concluded detracted from Plaintiff's credibility. (R. at 22-23.) The Undersigned concludes that the ALJ did not err in his reliance on the record evidence in assessing Plaintiff's credibility or in noting that Plaintiff continued to smoke though March 2010. *See Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) ("The ALJ's assessment of credibility is entitled to great weight and deference, since he had the opportunity to observe the witness's demeanor."); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).

Finally, the Undersigned finds no reversible error in the ALJ's finding that Plaintiff did not consistently take his diabetic medications and that he failed follow up with the Township Assistance paperwork. Evidence in the record supports each of these findings. For example, Plaintiff testified that although Township Assistance helped him once, he did not continue to seek their assistance because Township Assistance required him "to go to a lot of different places . . . to get more documentation for them." (R. at 44.) Plaintiff further acknowledged that he had been without medications for several months. (R. at 47.) Dr. Seabrook and Nurse Practitioner Choi also referenced Plaintiff's noncompliance with his medications and opined that his health condition would improve if he properly took his medications. (R. at 526.)

**B.     Consideration of Opinion Evidence**

Within this contention of error, Plaintiff posits that the ALJ improperly disregarded the opinion of his treating physician, Dr. Seabrook. He also challenges the ALJ's reliance upon Dr.

14

Izah's opinion.  The Undersigned finds no error in the ALJ's consideration and treatment of Drs. Seabrook and Izah's opinions.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ."  20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

In the instant case, the parties do not dispute that Dr. Seabrook is Plaintiff's treating physician.  The ALJ considered Dr. Seabrook's opinions, but accorded them "little weight."  (R. at 24-25.)  The ALJ explained his treatment of Dr. Seabrook's opinions as follows:

> After reviewing the record, I find that Dr. Seabrook's opinions are inconsistent with the medical records, including his own treatment records.  I also find that Dr. Seabrook's opinions were based on the claimant's subjective complaints, which render his opinion less persuasive.  The treatment records from the period at issue do not show such restrictive limitations due to his impairments.
>
> *        *        *
>
> The records from the period at issue show that the claimant's physical exams were normal until December 2010.  The medical records show that the claimant rarely had any objective problems or complaints in spite of medication non-compliance, which further suggests greater functional ability.  Additionally, the treatment records do not show significant neuropathy and edema despite his non-compliance with medications.  I note that Dr. Seabrook's opinion was quite conclusionary and he did not provide any explanation of the evidence relied on in forming his opinion.  Dr. Seabrook diagnosed the claimant with arthritis and spondylosis, but there is nothing in the record to support these diagnoses.  The records show that the claimant did not mention back pain to Dr. Seabrook until November 2010, even though Dr. Seabrook was treating Plaintiff every two to three months. (Ex. 7F & 17F).  Additionally, Dr. Seabrook's treatment records mostly consisted of routine visits for medication refills, treatment that does not lend strong support to the doctor's opinion.
>
> Moreover, even if I credited Dr. Seabrook's assessment, the limitations suggested on the questionnaire would only apply since February 13, 2011. (Ex. 16F, p.9).  Dr. Seabrook reported in his assessment that the claimant could do full time [competitive work at the sedentary level, if he was allowed to change positions every two hours.  (*Id.*)  I do not give weight to Dr. Seabrook's suggested limitations because they are unsupported by medical records.  Dr. Seabrook himself reported that the claimant is a malinger, which casts doubt on the claimant's credibility and suggests greater overall functioning ability.  (*Id.*)  Dr. Seabrook also stated that the claimant's condition would improve if he were to take proper medications for his conditions and go to a specialist for further evaluation and treatment.  Dr. Seabrook also acknowledged that he is not a specialist, which renders his opinion even less persuasive.  The records show that the claimant's kidney disease was treated with medications, and his blood sugar was only mildly elevated and he had no additional complaints.  (*Id.* at pp 2-31).

(R. at 24-25.)

The undersigned finds foregoing establishes that the ALJ provided good reasons for according Dr. Seabrook's opinions little weight, satisfying *Wilson's* procedural requirements. Because substantial evidence supports the ALJ's stated reasons, the Undersigned finds no error.

Further, the Undersigned finds that the ALJ did not err in according Dr. Izah's opinion "significant weight."  The ALJ determined that Dr. Izah's opinions were "consistent with the overall evidence of record."  (R. at 24.)  He added that Dr. Izah's opinions were "well supported by the physical examination findings."  (R. at 24.)  The ALJ also accorded "great weight" to the opinions of Drs. Whitely and Sands, state-agency reviewing physicians.  Significantly, the ALJ found Plaintiff to be *more* limited than Drs. Whitely and Sands.

**C.     Step Two Determination**

The Undersigned likewise finds no error in the ALJ's failure to include depression as a severe impairment at step two of his analysis.  Where the ALJ determines that a claimant had a severe impairment at step two of the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."  *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803, (6th Cir. 2003).  Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity."  20 C.F.R. § 404.1545(e); *Pompa*, 73 F. App'x at 803 (rejecting the claimant's argument that the ALJ erred by finding that a number of her impairments were not severe where the ALJ determined that claimant had at least one severe impairment and considered all of the claimant's impairments in her RFC assessment); *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (same).  Here, the ALJ found that Plaintiff had severe impairments and proceeded to

consider his non-severe impairments, including depression. (R. at 3-4.) Further, his conclusion that Plaintiff's depression is non-severe is consistent with Dr. Horton's opinion, which the ALJ accorded great weight. (R. at 18, 413.)

## D.     RFC Determination

Although Plaintiff submits that the ALJ failed to properly assess his RFC, he fails to offer any support for this assertion and neglects to set forth what additional limitations he believes the ALJ should have included. Regardless, the Undersigned finds no error in the ALJ's RFC formulation. A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). Further, an ALJ is required to explain how the evidence supports the limitations that he or she set forth in the claimant's RFC. S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted). Here, in connection with his RFC determination, the ALJ offered a narrative discussion describing how the record evidence supports the limitations he opined. Because substantial evidence supports his RFC determination, the Undersigned finds no error.

## E.     Step Four Finding

Plaintiff again fails to offer any support for his contention that the ALJ erred at step four of his determination. At step four, the ALJ concluded that Plaintiff was capable of performing his past relevant work as an unarmed security guard. In doing so, the ALJ properly relied upon

19

the VE's testimony. (R. at 25-26.) Regardless, even if the Court assumed that the ALJ erred in concluding that Plaintiff could perform his past work, such error would be harmless because the ALJ proceeded to step five and concluded that "there are other jobs existing in the national economy that he is also able to perform." (R. at 26.)

## VIII. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## IX. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: February 14, 2013                         ____/s/ *Elizabeth A. Preston Deavers*____
                                                 Elizabeth A. Preston Deavers
                                                 United States Magistrate Judge

21